**James FERNBACH, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee.**

**No. 69A01–1103–CR–151.**

Court of Appeals of Indiana.

Oct. 7, 2011.

---

Leanna Weissmann, Lawrenceburg, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Ian McLean, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

James Fernbach was convicted in Ripley Circuit Court of two counts of Class A felony attempted murder and sentenced to a total of sixty years incarceration. Fernbach appeals and presents two issues, which we restate as: (1) whether the jury clearly erred in finding Fernbach guilty but mentally ill instead of not guilty by reason of insanity; and (2) whether the sentence imposed by the trial court is inappropriate.

We affirm.

### Facts and Procedural History

Fernbach has a long history of mental illness. He has struggled with depression since elementary school, was committed to an institution when he was a teenager, and attempted suicide when he was sixteen years old. Fernbach has also had some history of violent behavior. When he was a young man, he fathered a child with a girlfriend, with whom he had a volatile relationship. Fernbach was arrested several times, for domestic violence, for threatening his girlfriend with an axe, for trying to strangle her, and for destroying items in their residence.

Fernbach later married his wife, Susan. In the fall of 2008, Fernbach began to have paranoid delusions. At one point, he fired a shotgun into the woods near his home, claiming that he was shooting at intruders. After this incident, his family members removed firearms from his home. Fernbach still displayed symptoms of his paranoia, including barricading the sliding door and windows of his home and putting nails in his gutters to prevent anyone from getting on his roof.

On a family vacation in September of that year, Fernbach thought his car was being followed. His family took him to an emergency room at a hospital in North Carolina, where he was prescribed anti-anxiety medication and told to see a mental health professional. Fernbach's symptoms did not improve, and he even went so far as to have family members taste his food to assure that it had not been poisoned. After Fernbach returned from vacation with family, he was taken to the emergency room at the Decatur County hospital. He was again treated for anxiety and released.

In October of 2008, Fernbach's family had him involuntarily committed at the University of Cincinnati hospital for seventy-two hours. There, Fernbach was diagnosed with bipolar disorder with psychotic tendencies. Nevertheless, he was released from the hospital after the seventy-two hour hold and continued to have delusions that people were talking about him and threatening his family.

Shortly after being released from the hospital in Cincinnati, Fernbach overdosed on Tylenol pills and was taken to the

emergency room. Fernbach's wife therefore took him to Quinco, a mental health facility in Batesville. Quinco personnel diagnosed Fernbach with bipolar disorder and also stated he possibly suffered from schizophrenia. Quinco monitored Fernbach and attempted to treat his problems with medication. Still, Fernbach continued to suffer from paranoid delusions, and eventually, he illegally purchased a handgun in Cincinnati.

On April 4, 2009, Fernbach went to a gas station and convenience store in Batesville. After talking to the cashier, he walked back out into the parking lot. There, he approached a vehicle belonging to Philip and Roberta Cruser, who had stopped at the station on their way to Cincinnati. When Mrs. Cruser entered the car after paying for fuel, Fernbach raised his two-shot derringer pistol to Mr. Cruser's head and shot him behind the ear. Fernbach then turned and saw Benjamin Dick. Fernbach walked toward Dick and raised the gun toward Dick's head. Dick grabbed Fernbach's arm in an attempt to defend himself. Fernbach was able to break free from Dick's grip and fired at Dick's head. The shot instead passed through Dick's hand and narrowly missed his head. As Dick lay on the ground, Fernbach tried to kick him in the head. Fernbach then started to reload the pistol with ammunition he had in his pocket. Dick tried to persuade Fernbach not to shoot him, saying, "man, ... I've got

kids ... the cops are coming ... you need to get the hell out of here." Tr. p. 488. Fernbach then got in his vehicle and fled. A bystander followed Fernbach, who sped away at a high rate. Once Fernbach got home, he told his wife that he "thought [he] killed somebody on accident." Tr. p. 936. Fernbach then called the police.[1]

The police responded and apprehended Fernbach. Fernbach initially told the police that he had little recollection of what had occurred, claiming that he was in a "daze" but could remember "squeezing the trigger." Tr. pp. 798–99. Fernbach later claimed that Dick had attacked him and that he was merely defending himself. Specifically, Fernbach claimed that he fired his gun in the air and that Dick was "coming at [Fernbach]." Tr. p. 802. Fernbach also stated that "the only thing I remember is swinging and hitting [Dick] and then him hitting the ground." *Id.*

Even later, Fernbach told the police that he acted in response to threats:

> The whole thing, I talked to this guy one day and this ... I was talking with him and I was speaking to him and we were joking around and I thought he was kidding about people getting hurt or harmed but I was talking to him and he was like, oh well, who do you want killed. I was like I don't want nobody killed. I said it eight times then finally said who do you want killed I said, ah, screw it the Indians[2] I guess, maybe my

---

**1.** Fernbach claims in his Appellant's Brief that he told the police that he had shot "terrorists." The State claims in its Appellee's Brief that the page of the Appendix cited by Fernbach contains no mention of "terrorists," and also claims that the transcript of the call, which was admitted into evidence at trial, contains no reference to terrorists. In his Reply Brief, Fernbach cites to page 451 of the Transcript of the trial, where the transcript of Fernbach's 911 call was played during the State's opening statement. There, Fernbach's first lines are transcribed as: "(unintelligible)

emergency because I think I just killed *terrorists* " Tr. p. 451 (emphasis added). The State is correct, however, that the admitted transcript of the 911 call itself transcribes Fernbach's first lines as: "My emer ... emergency is I think I just killed *somebody*." Ex. Vol. p. 1017 (emphasis added). Unfortunately, we were unable to locate a copy of the audio recording itself in the exhibits volume provided to us.

**2.** This is apparent reference to the owners of the convenience store.

ex-girl, maybe this and that. I didn't put nobody out there and meaning to have anybody killed. From then on is when it, I don't know what the hell has happened it's went crazy. People come up [and] threaten me.

Tr. pp. 805–06. Fernbach also asked one of the officers if he could get the death penalty for his crimes. The officer told Fernbach that that was a decision for a judge, not the police.

Fortunately, neither of Fernbach's victims died. Mr. Cruser was gravely injured and suffers from severe disabilities as a result of the gunshot wound to his head. Although Dick was not shot in the head, his hand was also severely injured and he remains disabled.

As a result of the shootings, the State charged Fernbach on April 6, 2009, with two counts of attempted murder. Fernbach pleaded not guilty by reason of insanity. A jury trial commenced on January 11, 2011 and concluded on January 18, 2011. The jury rejected Fernbach's insanity defense and instead found him guilty but mentally ill. At the conclusion of a sentencing hearing held on February 17, 2011, the trial court imposed the advisory sentence of thirty years on both of Fernbach's convictions and ordered the sentences to be served consecutively, for an aggregate term of sixty years. Fernbach now appeals.

### I. Rejection of Insanity Defense

Fernbach first claims that the jury's finding that he was guilty but mentally ill, as opposed to not guilty by reason of insanity, is clearly erroneous. To sustain a conviction, the State must prove each element of the charged offense—here attempted murder—beyond a reasonable doubt. *See Galloway v. State,* 938 N.E.2d 699, 708 (Ind.2010), *reh'g denied* (citing Ind.Code § 35–41–4–1(a) (2004); *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). But even if the

State meets this burden, a defendant in Indiana can avoid criminal responsibility by raising and successfully establishing what is commonly referred to as the "insanity defense." *Id.* (citing Ind.Code § 35–41–3–6(a) (2004)). "A successful insanity defense results in the defendant being found not responsible by reason of insanity[.]" *Id.* (citing Ind.Code §§ 35–36–2–3, –4 (2004)).

█ It is the defendant who bears the burden of establishing the insanity defense by a preponderance of the evidence. *Id.* (citing I.C. § 35–41–4–1(b)). To meet this burden, the defendant must establish both: (1) that he suffers from a mental illness, and (2) that this mental illness rendered him unable to appreciate the wrongfulness of his conduct at the time of the offense. *Id.* (citing I.C. § 35–41–3–6(a)). "Thus, mental illness alone is not sufficient to relieve [a defendant of] criminal responsibility." *Id.* (citing *Weeks v. State,* 697 N.E.2d 28, 29 (Ind.1998)). Instead, a defendant who is mentally ill but fails to establish that he was unable to appreciate the wrongfulness of his conduct may be found guilty but mentally ill. *Id.* (citing *Taylor v. State,* 440 N.E.2d 1109, 1112 (Ind.1982)).

█ The question of whether a defendant appreciated the wrongfulness of his conduct at the time of the offense is a question for the jury to determine. *Id.* at 709 (citing *Thompson v. State,* 804 N.E.2d 1146, 1149 (Ind.2004)). Although Indiana Code section 35–36–2–2 (2004) provides for the use of expert testimony to assist the jury in determining the defendant's insanity, the jury has extremely wide latitude and such expert testimony is merely advisory. *Id.* "[E]ven unanimous expert testimony is not conclusive on the issue of sanity." *Id.* (citing *Cate v. State,* 644 N.E.2d 546, 547 (Ind.1994)). The jury is free to disregard the unanimous testimony

of experts and rely instead on conflicting testimony by lay witnesses. *Id.* (citing *Barany v. State,* 658 N.E.2d 60, 63 (Ind. 1995)). Further, even if there is no conflicting lay testimony, the jury is free to disregard or discredit the expert testimony. *Id.* (citing *Thompson,* 804 N.E.2d at 1149); *see also Carson v. State,* 807 N.E.2d 155, 161–62 (Ind.Ct.App.2004) (noting that our supreme court in *Thompson* reaffirmed that the finder of fact is entitled to decide whether to credit the opinions of experts on insanity, even in the absence of lay witness testimony).

■■ It is the jury's province to weigh the evidence and assess the credibility of witnesses, and a finding that a defendant was not insane at the time of the offense thus warrants substantial deference from reviewing courts. *Id.* (citing *Barany,* 658 N.E.2d at 63). A defendant arguing on appeal that his insanity defense should have prevailed at trial faces "a heavy burden because he or she 'is in the position of one appealing from a negative judgment.'" *Id.* (quoting *Thompson,* 804 N.E.2d at 1149). On appeal, we will not reweigh evidence, reassess witness credibility, or disturb reasonable inferences made by the trier of fact, even though "more reasonable" inferences might have been made. *Id.* Although this standard of review is deferential, it is not impossible, and our supreme court has long held that "where the defendant claims the insanity defense should have prevailed, the conviction will be set aside 'when the evidence is without conflict and leads only to the conclusion that the defendant was insane when the crime was committed.'" *Id.* at 709–10 (citing *Thompson,* 804 N.E.2d at 1149; *Barany,* 658 N.E.2d at 63–64).

■ Here, Fernbach claims that the jury had no logical reason to reject his insanity defense. He focuses most of his argument on the fact that both expert witnesses testified that, in their opinion, Fernbach was insane at the time of the shootings. But, as noted above, even unanimous expert testimony is not conclusive on the issue of sanity because the jury is free to disregard the expert testimony and rely on conflicting testimony by lay witnesses or simply discredit the expert testimony. *Galloway,* 938 N.E.2d at 709. And indeed, as the State notes, there were several issues with the testimony of the expert witnesses that could have caused the jury to reasonably disregard their opinions on the issue of Fernbach's sanity at the time of the shootings.

Specifically, Dr. Coons accepted Fernbach's claims that he thought that his victims were "contract killers" without even reviewing Fernbach's statements to the police, where he made no such claim regarding contract killers.[3] Similarly, Dr. Kurzahls credited Fernbach's claim that he told the police that Cruse and Dick were contract killers, when, in fact, Fernbach made no such claim to the police. Dr. Kurzahls's opinion was also based in part on his belief that violence was "out of character" for Fernbach. Yet Fernbach's former girlfriend testified that Fernbach had threatened her with an axe and had tried to strangle her. And Fernbach had been involved in several prior instances of domestic violence. Moreover, Dr. Kurzahls spoke only with Fernbach and did not interview Fernbach's family, the victims, or any witnesses to the shootings. Yet Dr. Kurzahls admitted that a defendant's statements are among the least reliable sources for a complete psychiatric

---

**3.** Fernbach may have made reference to killing "terrorists" in his initial 911 call. *See* note 1, *supra.*

evaluation and that a complete evaluation should include more than just an interview of the defendant.

And in forming his opinion on Fernbach's sanity, Dr. Coons relied on the charging information, the probable cause affidavit, and a one-hour interview with Fernbach. Dr. Coons did not review any of Fernbach's medical records, nor did he speak with anyone other than Fernbach. Dr. Coons further agreed that a defendant's attempt to commit suicide after a crime could possibly be indicative of sanity, but he was unaware that Fernbach had attempted to commit suicide in jail shortly after he was arrested. Under these facts and circumstances, the jury could have reasonably decided to give little credit or weight to the opinion of these expert witnesses.

Fernbach further admits that the State produced testimony by lay witnesses that he was not insane at the time of the shootings. Fernbach's wife testified that nothing about Fernbach's behavior on the morning of the shooting concerned her. The convenience store clerk testified that Fernbach was acting normally when he spoke with her inside the store. Fernbach fled the scene of the crimes, suggesting that Fernbach knew the wrongfulness of his acts. The jail nurse testified that she thought Fernbach was faking the extent of his mental illness. Fernbach's ex-girlfriend testified that Fernbach knew the difference between right and wrong. Officer Holt, who interviewed Fernbach at the jail after the shootings, testified that although he thought Fernbach was mentally ill, he knew the difference between right and wrong. Officer Holbert testified that Fernbach knew the difference between right and wrong because Fernbach asked him if he could receive the death penalty for the shootings. We simply cannot discount this evidence.

Fernbach, however, claims that lay testimony concerning his demeanor is "unreliable when viewed through the lens of [his] serious mental illness." Appellant's Br. p. 14. But under the applicable standard of review, we are not permitted to reweigh evidence, reassess witness credibility, or disturb reasonable inferences made by the trier of fact, even though other inferences might have been made. *Galloway*, 938 N.E.2d at 709. Contrary to Fernbach's claim, *Galloway* does not permit us to reweigh the evidence.[4] Therefore, Fernbach's arguments that the evidence supporting his insanity defense was "compelling" and that the State's evidence was "weak" are misplaced.

We recognize that our supreme court in *Galloway* did note that the probative value of "demeanor evidence" has limits; still, the court also recognized that such evidence is "often useful." *Id.* at 713. "[D]emeanor evidence is of more limited value when the defendant has a long history of mental illness with psychosis." *Id.* And demeanor evidence before and after a crime is of more limited value than the defendant's demeanor during the crime, as the insanity defense concerns the defendant's mental state at the time of the crime. *Id.* at 714.

Although Fernbach did call the police, when questioned by the police he asked one of the officers whether he could receive the death penalty for his crimes, again indicating knowledge that his actions were criminal. And his suicide attempt in

4. The majority in *Galloway,* in discussing certain evidence the trial court relied on as probative of the defendant's sanity, did state that such evidence "when viewed against the defendant's long history of mental illness with psychotic episodes" was "neutral and not probative of sanity." 938 N.E.2d at 715. We do not understand this, however, as permitting an appellate court to reweigh evidence or judge the credibility of witnesses.

jail could also be construed as indicating knowledge of the wrongfulness of his conduct. The State also notes that Fernbach's version of the events became more elaborate as time went on. He first told the police that he remembered very little of what happened, and only later did he claim that he thought his victims were "contract killers." To be sure, Fernbach made credible explanations for many of these events. But, again, it is not our role as an appellate court to second-guess the jury's determination of what to believe and what to discredit.

▪ We also agree with the State that much of Fernbach's argument can be distilled to this: his crimes were without motive and irrational; therefore, Fernbach must have been insane at the time of the shootings. However, motive is not an element of the crime of attempted murder. *Kiefer v. State*, 761 N.E.2d 802, 806 (Ind. 2002). And while, all too often, horrific acts are irrational, this does not mean that the perpetrator of those acts must be legally insane. In fact, our supreme court has upheld the rejection of an insanity defense in cases where the crimes appear to have been completely irrational.

For example, in *Gambill v. State*, 675 N.E.2d 668, 671 (Ind.1996), the defendant drowned her five-year-old son, thinking that her companions were "devils" who were going to sacrifice her son. At her trial for murder, all four of the expert medical witnesses testified that Gambill was legally insane at the time of the murder. *Id.* at 672. However, two lay witnesses testified that, in their opinions, Gambill was able to appreciate the wrongfulness of her actions at the time of the offense. One police officer, who had known Gambill in high school, spent time with her at the hospital on the morning after the murder. He testified that he believed Gambill was able to appreciate the wrongfulness of her conduct. *Id.* And

a jail-house informant testified that she too believed that Gambill knew it was wrong to drown her son. *Id.* The court therefore held:

> there was a conflict of opinion on the question of Appellant's ability to appreciate the wrongfulness of her conduct. This being so, the conflict in the evidence was sufficient for the jury to determine that Appellant could appreciate the wrongfulness of her conduct, and the jury, acting within its power, disregarded the expert testimony.

*Id.* The court also noted that Gambill had failed to tell medical personnel that she had taken large quantities of methamphetamine before she killed her son. *Id.* And she also lied to the person who found her wandering the streets on the morning after the murder, when she claimed that she had been beaten and raped and that her former boyfriend had hurt her son. *Id.* at 672–73. "Such self-serving exculpatory statements might indicate to the jury that Appellant was aware of the wrongfulness of her actions." *Id.* at 673. The court therefore concluded that there was sufficient evidence in the record for the jury to reject Gambill's insanity defense. *Id.*

And in *Barany v. State*, 658 N.E.2d 60, 62–63 (Ind.1995), the defendant bit off the finger of his long-time girlfriend and swallowed it. When she ran into the house, the defendant shot her eight times while she tried to use the telephone. *Id.* at 63. He then struck her head and chest with a splitting maul. *Id.* Barany told his neighbors that he killed the victim because "all women [were] evil" and that he had bitten off her finger because it contained an "evil worm." *Id.* Barany then resisted arrest when the police arrived. At trial, three disinterested expert witnesses testified that, in their opinion, Barany was insane at the time of the murder. There was, however, other evidence indicating that the

defendant was sane. A police detective testified that Barany spoke about the victim's complaining and "nagging." *Id.* at 64. One of Barany's friends testified that he had seemed "O.K." *Id.* And Barany told his sister that he believed that his victim was telephoning the police when he shot her. *Id.* Given this evidence, our supreme court concluded that "the jury could have decided that this testimony about [Barany]'s behavior was more indicative of his actual mental health at the time of the killing than medical examinations conducted four weeks after the arrest." *Id.* Because there was conflicting evidence, the court refused to invade the jury's province as the fact finder. *Id.*

We find the present case to be very similar to both *Gambill* and *Barany*. The crimes in those cases appear to have been at least as irrational and senseless as Fernbach's shootings. And in both cases, the defendants appeared to suffer from some form of mental illness. Yet, despite the unanimous testimony of medical experts that the defendants in those cases were legally insane at the time of their crimes, the jury disregarded this evidence and instead gave credence to the other evidence, including lay witness testimony, indicating that the defendant was sane at the time of the crimes. Still, our supreme court refused to disturb the juries' verdicts. We are in much the same position here. Despite the expert testimony to the contrary, there was evidence, including lay witness testimony, supporting the jury's finding. And we may not invade the province of the jury on appeal.

Moreover, we find *Galloway* to be readily distinguishable from the present case. In *Galloway*, the testimony of the expert witnesses was that the defendant was insane at the time of the crime.[5] But there

was no lay opinion testimony that conflicted with the experts' opinions. 938 N.E.2d at 714. Instead, there were five lay witnesses whose testimony supported the experts' opinions. And the demeanor evidence was "neutral" and not probative of the defendant's sanity. *Id.* Furthermore, the trial court in *Galloway*, acting as the trier of fact, improperly relied on several facts as being indicative of sanity, i.e., the absence of plan or motive and the defendant acting without warning, the defendant's deteriorating to incompetence to stand trial, the defendant's failure to take medication, and that the defendant was "alert and oriented throughout the proceedings and assisted his counsel." *Id.* at 715. More importantly, the *Galloway* court seemed most concerned by the fact that the trial court rejected the defendant's insanity defense because it was concerned that the defendant could continue to be a danger to society because of the condition of the Indiana mental health system. *See id.* at 716.

We do not doubt that Fernbach suffers from some form of mental illness, and it is our sincere hope that he receives adequate treatment for his mental illness while in the custody of the Department of Correction. But the question is not whether *we* think Fernbach was insane at the time of the shootings. The question is whether there was sufficient evidence of probative value supporting the jury's conclusion that Fernbach was not insane at the time of his crimes. Under the facts and circumstances in the present case, we are unable to say that the jury's conclusion was clearly erroneous.

## II. Sentencing

Fernbach also argues that the sentence imposed by the trial court—consecutive,

---

5. *But see id.* at 718 (Shepard, C.J., dissenting) (explaining that one of the expert witnesses testified that he thought the defendant was *not* insane, but after a lengthy cross-examination involving numerous hypothetical questions, finally stated that he was "unsure.").

advisory terms of thirty years on each conviction—was inappropriate given the nature of his offense and the character of the offender. Pursuant to Indiana Appellate Rule 7(B), we may revise a sentence otherwise authorized by statute if, "after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender."

■ Although we have the power to review and revise sentences, "[t]he principal role of appellate review should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind.2008). Since the advisory sentence is the starting point our General Assembly has selected as an appropriate sentence for the crime committed, the defendant bears a particularly heavy burden in persuading us that his sentence is inappropriate when the trial court imposes the advisory sentence. *Golden v. State*, 862 N.E.2d 1212, 1216 (Ind.Ct.App.2007), *trans. denied.* This is a burden Fernbach has failed to meet.

■ As to the nature of Fernbach's crimes, both were violent and senseless. He shot Mr. Cruser, a complete stranger, in the head, causing serious disabilities. And he wounded another man, Dick, in the hand after that victim struggled with Fernbach while attempting to defend himself. Fernbach was preparing to reload his gun when Dick pleaded for his life and warned Fernbach that the police were en route. As a result of his gunshot wound, Dick has lost the ability to grip or exert strength in his hand. Although not as grave as Mr. Cruser's injuries, Dick's injuries are obviously not insignificant. And as to Fernbach's character, the trial court noted his mental illness and remorse as mitigators during sentencing. Nevertheless, Fernbach has a criminal history that includes violent offenses. Under these facts and circumstances, the trial court's decision to impose the advisory sentence was not inappropriate.

■ Fernbach's argument, however, goes more toward the trial court's decision to impose consecutive, rather than concurrent, sentences. Our supreme court has long recognized that "[c]onsecutive sentences reflect the significance of multiple victims." *Pittman v. State*, 885 N.E.2d 1246, 1259 (Ind.2008) (citing *McCann v. State*, 749 N.E.2d 1116, 1120 (Ind.2001)). Here, there were two victims, both of whom suffered serious injuries as a result of being shot by Fernbach. Thus, we cannot say that the trial court's decision to impose consecutive sentences was inappropriate.

After considering the nature of the offense and the character of the offender, and giving due consideration to the trial court's sentencing decision, we are unable to say that Fernbach has met his burden of demonstrating that his aggregate sixty-year sentence is inappropriate.

### Conclusion

The jury's rejection of Fernbach's insanity defense was not clearly erroneous, and the sentence imposed by the trial court was not inappropriate.

Affirmed.

BAILEY, J., and CRONE, J., concur.