## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 30 2020, 9:55 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald R. Shuler
Barkes, Kolbus, Rife & Shuler, LLP
Goshen, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Steven J. Hosler
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Devon W. Kyle,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

December 30, 2020

Court of Appeals Case No.
20A-CR-1217

Appeal from the
Elkhart Superior Court

The Honorable
Gretchen S. Lund, Judge

Trial Court Cause No.
20D04-1903-F5-57

**Kirsch, Judge.**

[1] Devon W. Kyle ("Kyle") appeals his convictions and sentence for operating a motor vehicle after forfeiture of license for life[1] as a Level 5 felony, possession of marijuana[2] as a Class B misdemeanor, possession of a synthetic drug or synthetic drug lookalike substance[3] as a Class A misdemeanor, operating a vehicle while intoxicated[4] as a Class C misdemeanor, and refusal to identify self[5] as a Class C misdemeanor. Kyle raises the following issues for our review:

I. Whether the evidence was insufficient to support his convictions for operating a motor vehicle after forfeiture of license for life and possession of a synthetic drug lookalike substance; and

II. Whether his sentence is inappropriate based on the nature of the offenses and his character.

[2] We affirm.

## Facts and Procedural History

[3] On the night of March 6, 2019, Elkhart Police Department Patrol Sergeant Drew Neese ("Officer Neese") was on patrol in downtown Elkhart. *Tr. Vol. 2* at 38-39. Officer Neese was heading east while stopped at an intersection when he

---

[1] *See* Ind. Code § 9-30-10-17(a)(1).

[2] *See* Ind. Code § 35-48-4-11(a)(1).

[3] *See* Ind. Code § 35-48-4-11.5(c).

[4] *See* Ind. Code § 9-30-5-2(a).

[5] *See* Ind. Code § 34-28-5-3.5.

observed a green Buick coming from the west that had its high beams on. *Id.*
Officer Neese flicked his lights "two [] or three [] times" to alert the Buick to
dim its lights; however, the Buick's lights, rather than dimming, were briefly
turned off completely before being turned back on with its high beams. *Id.* at
39-40. As the Buick left the intersection, Officer Neese did not see it swerve or
cross the center line, but due to the high beam lights, Officer Neese initiated a
traffic stop, and the Buick immediately pulled over. *Id.* at 40, 81-82.

[4]     Officer Neese asked the driver and passenger for identification, and around the
same time, Elkhart Police Department Corporal Jared Davies ("Officer
Davies") arrived as back-up. *Id.* at 41-42, 131-32. The driver did not have
physical identification but said his name was LaRon Kyle and provided a date
of birth. *Id.* at 42. Officer Neese noted that the driver's eyes were "kind of
glassy and bloodshot[,]" and he could smell the odor of alcoholic beverages
coming from the driver's breath. *Id.* at 43. Officer Neese noticed that the driver
was "squinting," which he thought was "kind of uncharacteristic because of the
cold weather." *Id.* He also observed that the driver's speech was slurred and
that he was visibly sweating in the twenty-degree weather. *Id.* at 44. Officer
Neese ran the name LaRon Kyle and the date of birth the driver provided
through a computer search in his patrol car, but the picture for LaRon Kyle did
not match the driver of the Buick. *Id.* at 45. Officer Neese returned to the
Buick and asked the driver for a social security number. *Id.* at 46. The driver
provided two different social security numbers. *Id.* Officer Neese returned to
his patrol car to run the two social security numbers on the computer, located a

picture of the driver on the computer that matched Kyle, went back to the driver's vehicle, and, after smelling the odor of raw marijuana on Kyle, asked him to step out of the vehicle and placed him under arrest. *Id.* at 46-47.

[5] Officer Davies performed a search of Kyle incident to his arrest and found a bag of what appeared to be marijuana and an additional three bags of a plant-like substance that appeared to resemble marijuana. *Id.* at 144-45; *State's Exs.* 3, 4. The four bags were weighed and field-tested using the Duquenois-Levine reagent test kits; the single bag of what appeared to be marijuana indicated the presence of THC and weighed twelve grams while the three bags of plant-like substance did not indicate the presence of THC and weighed a total of ten grams. *Tr. Vol. 2* at 147, 150, 156. In the meantime, Officer Neese searched Kyle's driving record in the Indiana Bureau of Motor Vehicles ("BMV") through his computer in his patrol car. *Id.* at 47. Neese saw that Kyle's license status was listed as "[h]abitual traffic violator for life." *Id.* at 71.

[6] Office Davies took Kyle to the Elkhart Police Department detention center where he attempted to administer a portable breath test to Kyle. *Id.* at 76. Kyle was unable to complete the test either due to his failure to follow instructions or to give a sample that registered on the machine. *Id.* at 77-78. Because of the inability to get a reading from the portable breath test, Officer Davies had Kyle perform three field sobriety tests: the horizontal gaze nystagmus test, the nine-step walk-and-turn test, and the one-leg stand test. *Id.* at 78, 179, 183, 188. Kyle failed each field sobriety test, which Officer Davies concluded was

consistent with intoxication. *Id.* at 182, 187, 190. Kyle was read Indiana's implied consent law and refused a certified test. *Id.* at 192-93.

[7] On March 7, 2019, the State charged Kyle with Level 5 felony operating a motor vehicle after forfeiture of license for life, Class B misdemeanor possession of marijuana, Class A misdemeanor possession of a synthetic drug or synthetic drug lookalike substance, Class C misdemeanor operating a vehicle while intoxicated, and Class C misdemeanor refusal to identify self.[6] *Appellant's App. Vol. 2* at 20.

[8] The trial court held a jury trial on February 17 and 18, 2020. *Id.* at 10-11. At trial, over Kyle's objection, the trial court admitted into evidence a certified copy of Kyle's driving record from the BMV and a redacted version of Kyle's BMV record. *Tr. Vol. 2* at 71; *State's Ex.* 1, 1(a). The redacted version of Kyle's certified driving record, State's Exhibit 1(a), was published to the jury.[7] *Tr. Vol. 2* at 71. Officer Neese testified that the redacted exhibit identified Kyle and that it showed his license status as an habitual traffic violator for life. *Id.* at 71-72. Officer Neese acknowledged that a certified record may still contain errors. *Id.*

---

[6] On February 5, 2020, the trial court granted the State's motion to amend the charging information to add an alternative spelling of Kyle's first name. *Appellant's App. Vol. 2* at 9-10, 43-45.

[7] The unredacted version, which was also admitted into evidence but was not published to the jury, indicates that Kyle's suspension was for an offense occurring on August 24, 2009 that resulted in a felony conviction on September 13, 2010 for operating a vehicle as an habitual traffic violator. *State's Ex.* 1 at 6, 8, 13, 16. The State sought to publish the redacted version to avoid any references to Kyle's prior convictions, including the September 13, 2010 conviction under Indiana Code section 9-30-10-16, which, at the time, resulted in a forfeiture of his driving privileges for life. *Tr. Vol. 2* at 66-67; *see* Ind. Code § 9-30-10-16(c) (2009) ("In addition to any criminal penalty, a person who is convicted of a felony under subsection (a) forfeits the privilege of operating a motor vehicle for life.").

at 93. Officer Davies testified that, when searching Kyle incident to his arrest, he found one bag of marijuana, which he immediately recognized as marijuana based on his training and experience and its distinct odor and appearance, and another "three (3) additional bags of a plant-like substance" on Kyle. *Id.* at 145-46; *State's Ex.* 3, 4. He stated that the single bag indicated the presence of THC, while the three additional bags did not. *Id.* at 150, 156. He testified that based on his training and experience the substance in the three bags was "[a] synthetic lookalike substance" because it was meant to be "consumed in the same way as marijuana; it looks similar to marijuana, but it has different chemical makeup than marijuana." *Id.* at 157. Office Davies also indicated that the three small bags were packaged similar to marijuana, which suggested that it was intended to be consumed like marijuana. *Id.* at 153-55, 217-18. Officer Davies explained that a synthetic drug or a synthetic drug lookalike substance has a "very sweet type [of] smell" that is "similar to potpourri," which is different from the "distinct odor" of marijuana. *Id.* at 136. Officer Davies testified that he did not know the chemical makeup of the substance in the three bags because they were not sent to the Indiana State Police Laboratory for testing and acknowledged that without testing of the substance's chemical composition he could not visually differentiate between a synthetic drug and a synthetic drug lookalike substance. *Id.* at 209-10, 225-26.

[9]     At the conclusion of the trial, the jury found Kyle guilty as charged. *Tr. Vol. III* at 20-21. The trial court held a sentencing hearing on June 10, 2020. *Appellant's App. Vol. 2* at 12-13. The trial court heard argument from Kyle's counsel and

the State and was able to review Kyle's presentence investigation report ("PSI"). In sentencing Kyle, the trial court found in mitigation that Kyle had lived a significant time without engaging in criminal activity and that he had taken responsibility for his actions. *Tr. Vol. III* at 35-36. In aggravation, the trial court found that Kyle had previous violations of the conditions of community supervision in the past and had a history of criminal activity. *Id.* As to his Level 5 felony conviction for operating a motor vehicle after forfeiture of license for life, the trial court observed that he arrived at his habitual traffic violator status due to "a number of [d]riving [w]hile [l]icense [s]uspended previous convictions" and that the advisory sentence of three years on that conviction was "appropriate." *Id.* at 36. Kyle's sentence was as follows: three years executed in alternative placement through community corrections for operating a motor vehicle after forfeiture of license for life with one year suspended; 180 days for Class B misdemeanor possession of marijuana; one year for Class A misdemeanor possession of a synthetic drug or synthetic drug lookalike substance; sixty days for Class C misdemeanor operating a vehicle while intoxicated; and sixty days for Class C misdemeanor refusal to identify self. *Tr. Vol. III* at 36-37; *Appellant's App. Vol. 2* at 130-33. Kyle's sentences were all ordered to run concurrently. *Id.* Kyle now appeals.

## Discussion and Decision

### I. Sufficiency of the Evidence

[10] Kyle argues that the evidence was insufficient to sustain his convictions for Level 5 felony operating a vehicle with a lifetime suspension and Class A

misdemeanor possession of a synthetic drug or synthetic drug lookalike substance. When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh evidence nor judge witness credibility. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id.* We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id.*

[11] We first address Kyle's argument regarding the sufficiency of the evidence for his conviction of Level 5 felony operating a vehicle with a lifetime suspension. At the time, he committed the offense, the statute provided, in pertinent part, that a "person who . . . operates a motor vehicle after the person's driving privileges are forfeited for life under section 16 of this chapter . . . commits a Level 5 felony." Ind. Code § 9-30-10-17(a).[8] To obtain a conviction under this section, the State must prove only two elements: (1) "that the defendant operated a motor vehicle"; and (2) "that the defendant's driving privileges had been forfeited for life." *Brock v. State*, 955 N.E.2d 195, 204-05 (Ind. 2011) (quoting *Pierce v. State*, 737 N.E.2d 1211, 1213-14 (Ind. Ct. App. 2000), *trans. denied*). *See also Ford v. State*, 711 N.E.2d 86, 88 (Ind. Ct. App. 1999), *trans. denied*.

---

[8] Indiana Code section 9-30-10-17 was amended in 2019 by Public Law No.184-2019, SECTION. 7. The amendments to the statute do not have any effect on the outcome of this appeal.

[12] Citing *Chastain v. State*, 58 N.E.3d 235, 238 (Ind. Ct. App. 2016) for the proposition that penal statutes "must be strictly construed against the State[,]" Kyle argues that the State's evidence, a certified copy of Kyle's driving record from the BMV, established only that Kyle's driving privileges were suspended for 199 years as opposed to forfeiture for life as required by statute. He contends that only the certification page of Kyle's certified driving record lists his driver's license status as suspended for life. According to Kyle, this renders the State's evidence "insufficient as a matter of law," and his conviction for the offense should be vacated. *Appellant's Br.* at 13.

[13] We agree with Kyle that penal statutes must be construed against the State. We disagree with Kyle that application of that principle to his case renders the State's evidence insufficient to convict him. Here, as evidence that Kyle's driving privileges were forfeited for life, the jury had before it a redacted version of Kyle's certified driving record.[9] Contrary to his contention that the sole

---

[9] Indiana Code section 9-30-3-15 provides that a certified computer printout of the relevant portions of the defendant's driving record is prima facie evidence of a prior conviction. That statute provides as follows:

> In a proceeding, prosecution, or hearing where the prosecuting attorney must prove that the defendant had a prior conviction for an offense under this title, the relevant portions of a certified computer printout or electronic copy as set forth in IC 9-14-3-4 made from the records of the bureau are admissible as prima facie evidence of the prior conviction. However, the prosecuting attorney must establish that the document identifies the defendant by the defendant's driving license number or by any other identification method utilized by the bureau.

Ind. Code § 9-30-3-15; s*ee also Brock v. State*, 955 N.E.2d 195, 205 (Ind. 2011); *Pierce v. State*, 737 N.E.2d 1211, 1214 (Ind. Ct. App. 2000), *trans. denied*. Kyle cites to trial testimony that a certified record may still contain erroneous information, that the redacted exhibit contained a different driver's license number, but neither Kyle nor the transcript indicate where that error appears, and he does not contend on appeal that the redacted exhibit otherwise fails to identify him. *Tr. Vol. 2* at 93.

reference to his driver's license status being listed as suspended for life occurs on the certification page of the redacted exhibit, the first page of the exhibit, titled "Indiana Official Driver Record," specifically states "License status: HABITUAL TRAFFIC VIOLATOR – LIFE." *State's Ex.* 1(a) at 30. The redacted exhibit removed any reference to Kyle's prior conviction but listed a suspension with an effective date of September 13, 2010 and an expiration date of September 13, 2299 and that the notice of suspension was mailed on September 20, 2010. *Id.* at 32. The redacted exhibit included the corresponding mailing of the notice of suspension from the BMV informing Kyle that his driving privileges were suspended for a period of 199 years "effective 9/13/2010 through 9/13/2299." *Id.* at 39. It also included a document titled, "How to Read [a BMV] Official Driver Record," applicable to driver's record printouts printed after June 30, 2016, noting that a driver's license status with the designation "HABITUAL TRAFFIC VIOLATOR – LIFE" indicated that the driver's "[d]riving privileges are forfeited for life as a habitual traffic violator[.]" *Id.* at 48. Kyle's argument is an invitation for us to reweigh the evidence, which we cannot do. *See Bailey*, 907 N.E.2d at 1005. A reasonable jury reviewing the information contained within the redacted exhibit could conclude that Kyle's driving privileges were suspended for life. The State's evidence was sufficient to support Kyle's conviction for Level 5 felony operating a vehicle with a lifetime suspension.

[14] We next address the sufficiency of the evidence for Kyle's conviction of Class A misdemeanor possession of a synthetic drug lookalike substance. Kyle

contends that the State failed to present sufficient evidence to show that the substance found on his person was a synthetic drug lookalike substance. At the time Kyle committed the offense, and before the statute that criminalized the offense was repealed on July 1, 2019, Indiana Code section 35-48-4-11.5[10] provided, in pertinent part that "[a] person who knowingly or intentionally possesses a synthetic drug or synthetic drug lookalike substance commits possession of a synthetic drug or synthetic drug lookalike substance, a Class A misdemeanor." The statute also provided that a "'synthetic drug lookalike substance' has the meaning set forth in I.C. 35-31.5-2-321.5(a)(2)." Ind. Code § 35-48-4-11.5. At the time Kyle committed the offense, Indiana Code section 35-31.5-2-321.5[11] provided as follows:

> (a) "Synthetic drug lookalike substance", except as provided in subsection (b), means one (1) or more of the following:
>
> (1) A substance, other than a synthetic drug, which any of the factors listed in subsection (c) would lead a reasonable person to believe to be a synthetic drug.
>
> (2) A substance, other than a synthetic drug:
>
> (A) that a person knows or should have known was intended to be consumed; and

---

[10] This section was repealed by Public Law No. 80-2019, SECTION 30.

[11] This section was repealed by Public Law No. 80-2019, SECTION 15.

(B) the consumption of which the person knows or should have known to be intended to cause intoxication.

(b) The term "synthetic drug lookalike substance" does not include the following:

(1) Food and food ingredients (as defined in IC 6-2.5-1-20).

(2) Alcohol (as defined in IC 7.1-1-3-4).

(3) A legend drug (as defined in IC 16-18-2-199).

(4) Tobacco.

(5) A dietary supplement (as defined in IC 6-2.5-1-16).

(c) In determining whether a substance is a synthetic drug lookalike substance, the following factors may be considered:

(1) The overall appearance of a dosage unit of the substance, including its shape, color, size, markings or lack of markings, taste, consistency, and any other identifying physical characteristics.

(2) How the substance is packaged for sale or distribution, including the shape, color, size, markings or lack of markings, and any other identifying physical characteristics of the packaging.

(3) Any statement made by the owner or person in control of the substance concerning the substance's nature, use, or effect.

(4) Any statement made to the buyer or recipient of the substance suggesting or implying that the substance is a synthetic drug.

(5) Any statement made to the buyer or recipient of the substance suggesting or implying that the substance may be resold for profit.

(6) The overall circumstances under which the substance is distributed, including whether:

(A) the distribution included an exchange of, or demand for, money or other property as consideration; and

(B) the amount of the consideration was substantially greater than the reasonable retail market value of the substance the seller claims the substance to be.

A "synthetic drug" is defined with reference to chemical compounds and includes any chemical compound determined to be a synthetic drug by rule adopted by the Indiana board of pharmacy. *See* Ind. Code § 35-31.5-2-321.

Kyle appears to argue that without testing the substance the State could not show that it was a synthetic drug because its chemical composition was unknown. He contends that Officer Davies's testimony alone could not establish that the substance was a synthetic drug lookalike substance because it had never been tested to confirm its identity and Officer Davies acknowledged minute observable differences between a synthetic drug and a synthetic drug lookalike substance.

[16]     In *Yoakum v. State*, another panel of this court addressed the sufficiency of the evidence for a conviction under Indiana Code section 35-48-4-11.5  95 N.E.3d 169, 173 (Ind. Ct. App. 2018), *trans. denied*.  The defendant in that case argued the State's evidence was insufficient to prove that the substance was a synthetic lookalike substance because there was no scientific testing of the substance, and the officers' testimony did not establish that the substance was a synthetic drug lookalike substance.  *Id.* at 174.  We rejected the defendant's arguments, explaining:

> "For offenses involving controlled substances, the State is not required to introduce the subject contraband to obtain a conviction for dealing or possession." *Boggs v. State*, 928 N.E.2d 855, 865 (Ind. Ct. App. 2010), *trans. denied*.  The identity of a controlled substance may be established through witness testimony and circumstantial evidence. *Helton v. State*, 907 N.E.2d 1020, 1024 (Ind. 2009).  Our [S]upreme [C]ourt has held that, although "chemical analysis is one way, and perhaps the best way, to establish the identity of a compound," the testimony of "someone sufficiently experienced with the drug may establish its identity, as may other circumstantial evidence." *Vasquez v. State*, 741 N.E.2d 1214, 1216 (Ind. 2001).

*Id.* at 175.  In affirming the defendant's conviction for knowing or intentional possession of a synthetic drug lookalike substance, we noted that the officers testified that they had experience recognizing synthetic marijuana and that the recovered substance looked like synthetic marijuana, smelled like synthetic marijuana, and was packaged in a ripped plastic baggie.  *Id.*

[17]     Here, Officer Davies stated that a synthetic drug or a synthetic drug lookalike substance has a "very sweet type [of] smell" that is "similar to potpourri" and different from the "distinct odor" of marijuana. *Id.* at 136. When trying to differentiate marijuana from a synthetic drug or a synthetic drug lookalike substance, Officer Davies testified that "they look similar in appearance" but "if you put them side-by-side, there's a noticeable difference," but "you look for the color – whether it's green, brown. It's a plant-like material as well, but it is finely chopped up, it's not a [sic] leafy or kept in buds like marijuana is." *Id.* at 137. Officer Davies testified that he found one bag of marijuana[12] and "three (3) additional bags of a plant-like substance" on Kyle. *Tr. Vol. II* at 145; *State's Ex.* 3, 4.

[18]     Officer Davies testified that the three bags of plant-like substance recovered from Kyle's pants pocket appeared visually similar to marijuana in that it was a brown-green plant like substance, but that it was finely chopped and had a potpourri smell that he had explained was typical of synthetic drugs and synthetic drug lookalike substances. *Id.* at 136, 153; *State's Ex.* 4. Officer Davies did not believe that the substance in the three bags was marijuana but field-tested the three bags for THC and none contained THC. *Id.* at 156. As to the substance's chemical composition, Officer Davies testified that he did not

---

[12] Officer Davies testified he was able to determine that the bag was marijuana based on his experience and training, describing the substance as "a brown, green, leafy substance" that had a "distinct and pungent" odor. *Tr. Vol. II* at 146. The substance also field-tested positive for THC, the active ingredient in marijuana. *Id.* at 150.

know the chemical makeup of the substance in the three bags because they were not sent to the Indiana State Police Laboratory for testing. *Id.* at 209-10. He also acknowledged that without testing of the substance's chemical composition, he could not visually differentiate between a synthetic drug and a synthetic drug lookalike substance. *Id.* at 225-26. However, he testified that based on his training experience the substance in the three bags was "[a] synthetic lookalike substance" because it was meant to be "consumed in the same way as marijuana; it looks similar to marijuana, but it has different chemical makeup than marijuana." *Id.* at 157. Office Davies also indicated that the three small bags were packaged similar to marijuana, which suggested that it was intended to be consumed like marijuana. *Id.* at 153-55, 217-18. As noted, while chemical analysis may establish the identity of a substance, it is not always necessary, where, as here, the jury heard Officer Davies' testimony regarding the substance and saw the exhibits depicting both the marijuana and the synthetic drug lookalike substance and determined that it was a synthetic drug lookalike substance. *See Vasquez*, 741 N.E.2d at 1216; *Yoakum*, 95 N.E.3d at 175. The State's evidence was sufficient to demonstrate that Kyle knowingly or intentionally possessed a synthetic drug lookalike substance; therefore, the evidence was sufficient to sustain his conviction.

## II. Inappropriate Sentence

[19] Kyle next contends that his sentence is inappropriate in light of the nature of the offense and his character. Pursuant to Indiana Appellate Rule 7(B), this court "may revise a sentence authorized by statute if, after due consideration of the

trial court's decision, the [c]ourt finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Whether a sentence is inappropriate turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and other factors that come to light in a given case. *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). We defer to the trial court's decision, and our goal is to determine whether the appellant's sentence is inappropriate, not whether some other sentence would be more appropriate. *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). When we review a sentence, we seek to leaven the outliers, not to achieve a perceived correct result. *Cardwell*, 895 N.E.2d at 1225. On appeal, it is the defendant's burden to persuade us that the sentence imposed by the trial court is inappropriate. *Shell v. State*, 927 N.E.2d 413, 422 (Ind. Ct. App. 2010).

[20] The advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Abbott v. State*, 961 N.E.2d 1016, 1019 (Ind. 2012). A reviewing court is thus "unlikely to consider an advisory sentence inappropriate." *Shelby v. State*, 986 N.E.2d 345, 371 (Ind. Ct. App. 2013), *trans. denied*. Rather, the defendant "bears a particularly heavy burden in persuading us that his sentence is inappropriate when the trial court imposes the

advisory sentence." *Fernbach v. State*, 954 N.E.2d 1080, 1089 (Ind. Ct. App, 2011), *trans. denied.* Here, Kyle was sentenced on his conviction for Level 5 felony operating a vehicle after forfeiture of license for life to three years with two years executed in alternative placement through community corrections and one year suspended to probation. *Appellant's App. Vol. 2* at 130-34; *Tr. Vol. III* at 36-37. Kyle's sentences on his misdemeanor convictions were all ordered to be served concurrently to his Level 5 felony conviction; thus, Kyle received an aggregate sentence of three years. *Id.* Kyle's Level 5 felony offense carries an advisory sentence of three years with a sentencing range of one to six years. Ind. Code § 35-30-2-6. Kyle received the advisory sentence for his Level 5 felony conviction.

[21] As to the nature of his offense, Kyle argues that his offense was "unremarkable" and "mundane" in that, while he was driving while suspended, he was not driving erratically and was generally cooperative, and his offense did not result in violence or physical harm to any person or property. *Appellant's Br.* at 17. The nature of the offense is found in the details and circumstances of the commission of the offense and the defendant's participation. *Perry v. State*, 78 N.E.3d 1, 13 (Ind. Ct. App. 2017). The nature of Kyle's offense shows that he was not observed to be driving erratically and was initially pulled over for failure to dim his bright lights. *Tr. Vol. II* at 38-40, 81-82. Kyle's offense did not involve violence or result in physical harm to any person or property. When Kyle was pulled over and was approached by Officer Neese, Kyle provided false information as to his identity, which inhibited the investigation,

drove while intoxicated, and possessed contraband, albeit in relatively small amounts. *Id.* at 41-47, 144-45, 147, 150, 156-57, 182, 187, 190. We cannot say that Kyle's sentence was inappropriate in light of the nature of the offense.

[22] As to his character, Kyle argues that his criminal history "consists of operating offenses and misdemeanors" and, when coupled with the favorable aspects of his character, should result in revision of his sentence. *Appellant's Br.* at 18. "The character of the offender is shown by the offender's life and conduct." *Croy v. State*, 953 N.E.2d 660, 664 (Ind. Ct. App. 2011). When considering the character of the offender, one relevant fact is the defendant's criminal history. *Johnson v. State*, 986 N.E.2d 852, 857 (Ind. Ct. App. 2013).

[23] Here, the trial court identified Kyle's history of criminal or delinquent activity in aggravation, and it also noted that Kyle's last conviction occurred approximately ten years before the instant conviction. *Tr. Vol. III* at 35. Kyle, who was thirty-seven at the time of sentencing, had accumulated adult criminal convictions which included Class A misdemeanor theft, Class C felony armed robbery, Class D felony theft, Class C felony burglary, and Class A misdemeanor domestic battery in the presence of a child under the age of sixteen. *Appellant's Conf. App. Vol. 2* at 110-12. Kyle had also previously violated the terms of community supervision. *Id.* at 111; *Tr. Vol. III* at 29, 35. In addition, Kyle compiled an extensive list of traffic violations, including three convictions for operating a vehicle without ever receiving a license, one conviction for driving while suspended, and a conviction for operating a vehicle

as an habitual traffic violator on September 13, 2010.[13] *Appellant's Conf. App. Vol. 2.* at 110-13. The trial court noted that Kyle took responsibility for his actions and that a significant length of time had elapsed between his most recent criminal conviction and the instant convictions, which the trial court determined reflected favorably on him. It also observed that despite the length of the time between convictions Kyle had attained his habitual traffic violator status due to "a number of [d]riving [w]hile [l]icense [s]uspended previous convictions." *Id.* at 36. Although we acknowledge that Kyle's volunteering at the Boy's and Girl's Club and his employment history are favorable factors, we cannot say that Kyle has met his burden to show that his three-year sentence is inappropriate in light of his character.[14] *See Fernbach*, 954 N.E.2d at 1089 (noting that the burden to show a sentence is inappropriate is "particularly heavy" when the trial court imposes the advisory sentence).

---

[13] Kyle cites *Douglas v. State*, 878 N.E.2d 873 (Ind. Ct. App. 2007), *Ruiz v. State*, 818 N.E.2d 927 (Ind. 2004) and *Westmoreland v. State*, 787 N.E.2d 1005 (Ind. Ct. App. 2003) in support of his position that his sentence is inappropriate in light of his character. We note that in those cases courts revised enhanced or maximum sentences to the presumptive sentences on the basis of time between criminal convictions or criminal history that was minor or dissimilar to the particular conviction. *Douglas*, 878 N.E.2d at 881, *Ruiz*, 818 N.E.2d at 929-30, *Westmoreland*, 787 N.E.2d at 1011-12. Here, Kyle received the advisory sentence (the equivalent to the presumptive sentence under the old sentencing scheme) and not an enhanced sentence. Therefore, we do not find those cases persuasive.

[14] To the extent Kyle contends that the principles behind *Sanquenetti v. State*, 917 N.E.2d 1287 (Ind. Ct. App. 2009) support a revision of his sentence, we disagree. In *Sanquenetti*, we revised a defendant's four-year advisory sentence for Class C felony nonsupport of a dependent child to two years, holding that because certain portions of the defendant's support arrearage accrued within the timeframe for which she had already been charged, convicted, and sentenced, it was error to consider those portions again when assessing the nature of the offense for sentencing purposes. 917 N.E.2d at 1290-92. We cannot say that *Sanquetti* supports a revision of Kyle's sentence.

Affirmed.


Bradford, C.J., and May, J., concur.