


FILED

Apr 25 2025, 9:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

James Beau Burkhart,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

April 25, 2025

Court of Appeals Case No.
24A-CR-1237

Appeal from the Wayne Superior Court

The Honorable Charles K. Todd, Jr., Judge

Trial Court Cause No.
89D01-2012-MR-000003

---

**Opinion by Judge Felix**
Judges Mathias and Foley concur.

**Felix, Judge.**

## Statement of the Case

With the help of a friend, 16-year-old James Beau Burkhart ("Beau") shot and killed his father; he then celebrated his father's death by taking photos and videos of his father's corpse and later getting an image of the murder weapons tattooed on his chest. Beau was charged with and convicted of murder. The trial court sentenced Beau to 55 years of incarceration. Beau now appeals and raises two issues for our review:

1. Whether the trial court abused its discretion by excluding certain evidence at trial; and
2. Whether Beau's sentence is inappropriate under Indiana Appellate Rule 7(B).

We affirm.

## Facts and Procedural History

In December 2020, Beau was 16 years old and lived with his parents, James Jason Burkhart ("Father") and Fabiola Burkhart ("Mother"), and his younger brother ("Brother") in Centerville, Indiana. Burkhart's friend Lucas Benkert ("Benkert") was 15 years old and lived with his father, Matthew Benkert ("Matthew"), in Centerville. Matthew owned a .380 that he kept on the television stand in the living room, and Benkert owned a 0.22 revolver that he kept in his bedroom.

[4] On December 14, Beau was suspended from school for three days for fighting another student. The next day, Beau was messaging his girlfriend about Father, telling her, "Imma piss him mofff" because "I got a knife on me," Ex. Vol. I at 45–46 (errors in original); "I really feel like stabbing someone," *id.* at 46; "I want this f[*]ggot out of my house," *id.* at 50; "I hope someone pulls up to my crib tryna box and just shoots my das s . . . F[*]ck that would be the best thing ever . . . Maybe I should start beef wit someone . . . Who goin kill my dad," *id.* at 51 (errors in original). This was not the first time Beau had talked about wanting to harm Father, having previously told his girlfriend that he wanted to "stab[ Father], fight[] him, punch[] him, scream[] at him." Tr. Vol. IV at 110. Beau had also told a prior girlfriend that he "wished [Father]'s car would run off the road" when Father drove on icy roads. *Id.* at 164.

[5] On December 15, Beau was messaging the student he fought as well as the student's friends. Believing another fight would occur between Beau and the student, Benkert visited Beau at Beau's home sometime in the afternoon. When Father learned why Benkert was visiting Beau, Father confiscated Beau's cell phone. Father then took Beau and Benkert to get food, and the three returned to the house to eat. While Beau and Benkert were eating in another room, Father and Mother were arguing in the living room. A phone call interrupted their argument, and after he ended the call, Father told Beau and Benkert it was time to take Benkert home. Before leaving, Father allegedly told Mother, "I'll deal with you when I get back." Tr. Vol. III at 82.

[6] At approximately 7:10 p.m. on December 15, Father, Beau, and Benkert arrived at Benkert's residence. Benkert invited Father to come inside to meet Matthew, and as Benkert entered the residence or shortly thereafter, he called for Matthew. But Benkert knew Matthew was not home; just the day before, Benkert had asked Matthew when he expected to be home from work on December 15, and Matthew told him it would be between 8:00 p.m. and 9:00 p.m. Shortly before he visited Beau on December 15, Benkert had moved the surveillance camera in his residence so it would not capture any video inside the home; it still recorded audio.

[7] In the audio captured by the surveillance camera, after he called for Matthew, Benkert tells someone, presumably Father, "He's in the bathroom." State's Ex. 403 at 12:48–12:53. Less than five seconds later, a gunshot and a loud thud—likely Father's body dropping to the floor—are heard. Benkert immediately exclaimed, "Holy f[*]cking sh[*]t. You just f[*]cking did it." *Id.* at 12:57–13:02. After some back and forth, Benkert told Beau, "Yeah, you just killed your f[*]cking dad." *Id.* at 14:16–14:19. Just minutes later, Beau can be heard on the surveillance video saying, "Dad, are you alive? Good. I hope you die in hell, you f[*]cking d[*]ck. That's what you get for treating my mom like sh[*]t. You hear me? Don't ever come back in another life, f[*]cker." *Id.* at 17:56–18:02. Benkert then told Beau not to "put another bullet in him," *id.* at 18:53–18:56, but seconds later, another gunshot is heard, after which Benkert said, "Now he's dead," *id.* at 19:02–19:04. The first shot fired was from a .380, and the second shot fired was from a .22 revolver.

[8] Once Beau and Benkert decided that Benkert would take the blame for shooting Father, the two proceeded to take photos and videos of the murder scene. In one video, the camera was focused on Father's bloody face while Beau said, "We don't f[*]ck with p[*]ssies like you little bitch [*]ss n[*]gga. Get the f[*]ck off my block bitch [*]ss." State's Ex. 436.[1] In another video, a smiling Beau had the camera in selfie mode and filmed himself with a handgun that appeared to be a .380, saying, "Hey. That n[*]gga thought we wasn't hard, huh? That's what you said, right? Hold on. That's what he said?" *Id.* Benkert can be heard in the background responding, "That's what he said." *Id.* In yet another video, the camera was focused on Father's bloody face while Beau stated, "Said we wasn't hard. All dead and sh[*]t, bitch. Put one in his head." *Id.* Beau then crouched down, pointed the handgun at Father's head, and pretended as if he was firing that gun while saying "pow." *Id.*

[9] In total, Father sustained two gunshot wounds—one to the head and one to the back of the neck. The gunshot wounds caused Father's death, and either one could have done so independently of the other.

[10] Shortly before 8:00 p.m., Benkert left his residence in Father's car and drove to his mother's residence where he confessed to her that he shot Father. At approximately 9:00 p.m., Benkert called a friend and confessed to shooting Father. Benkert later sent that friend a picture of Father's dead body. Also at

---

[1] State's Exhibit 436 consists of multiple photos and videos that are identified individually by only their file names. We do not include those file names here.

approximately 9:00 p.m., Matthew returned home from work. Matthew found Father's body in the doorway to Benkert's bedroom. Matthew exited his residence and called 911.

[11] After the shooting, Beau returned home on foot, and he told Mother that Benkert shot Father. At approximately 9:22 p.m., Mother called 911 and reported what Beau had told her.

[12] At approximately 9:45 p.m., Benkert texted Matthew, "delete the camera app off your phone." Ex. Vol. I at 98. Benkert drove Father's car to the Columbus, Ohio, area where he crashed it while fleeing from law enforcement. Benkert's .22 revolver and the surveillance camera from his residence were found in the car after the crash.

[13] On December 16, Beau visited his girlfriend and told her "[t]he whole story." Tr. Vol. IV at 112. Specifically, Beau told his girlfriend that when he, Father, and Benkert arrived at Benkert's residence, he and Benkert went inside and to Benkert's room while Father stayed in the car. Beau "said something along the line of like this is like the perfect time or something. . . . And then they somehow got [Father] in the house . . . ." Id. at 112–13. Beau "pointed the gun at [Father] while he was facing away from [Beau] but then [Father] turned around and [Beau] got scared so put it back like behind his back." Id. at 113. Beau told his girlfriend that when Father turned back around, Beau shot him, and Beau admitted to shooting Father more than once. Beau did not tell his girlfriend that Benkert shot Father; instead, he claimed to be the only shooter,

(*id.*), and that he shot Father because "he wanted the abuse to stop," *id.* at 116. The next day, while on a video call, Beau showed his girlfriend a case of bullets and a gun, and she heard Mother reprimand Beau for doing so.

[14] At some point after Father's death, Beau got a tattoo on his chest of a .380 and a .22 revolver. The tattoo also included the words "Never Gonna Be The Same." Ex. Vol. I at 97.

[15] The State charged Beau with murder[2] and alleged he had used a firearm[3] in committing that murder. Before trial, Beau filed a notice of his intent to argue he acted in self-defense when he shot Father and his intent to offer effects of battery[4] evidence at trial. The trial court allowed Beau to pursue these defenses. Beau also sought to present evidence of Father's criminal activity from 1989 and 1990 to support the reasonableness of his belief that it was necessary to act in self-defense when he shot Father. The trial court denied Beau's request and granted the State's motion in limine precluding him from presenting that evidence.

[16] At trial, Beau submitted an offer of proof regarding Father's prior convictions. Beau proffered testimony from Mother that she had told Beau that Father "already had a battery charge" and that Father, in front of Beau and Brother,

---

[2] Ind. Code § 35-42-1-1(1).

[3] I.C. § 35-50-2-11(d) (effective July 1, 2016, to June 30, 2021).

[4] I.C. §§ 35-31.5-2-109; 35-41-3-11.

"would say if I go back to prison, I'm going to make it worth my time." Tr. Vol. IV at 175. Beau also proffered records relating to Father's prior criminal cases from 1989 and 1990.[5] After the offer of proof, the trial court again determined that Beau could not present evidence of Father's prior convictions.

[17] The jury found Beau guilty of murder, and the trial court found he had used a firearm in the commission of that offense. The trial court sentenced Beau to a total of 55 years executed at the Indiana Department of Correction ("DOC"). This appeal ensued.

## Discussion and Decision

### 1. The Trial Court Did Not Abuse Its Discretion by Excluding Certain Evidence at Trial

[18] Beau claims that the trial court abused its discretion in not admitting certain evidence at trial. We review rulings on admissibility of evidence for an abuse of discretion. *Russell v. State*, 234 N.E.3d 829, 858 (Ind. 2024) (quoting *Conley v. State*, 972 N.E.2d 864 (Ind. 2012)), *cert. denied*, 145 S.Ct. 424 (2024). "[W]e may affirm the trial court's decision on any basis supported by the record," *Means v. State*, 201 N.E.3d 1158, 1163 (Ind. 2023) (citing *Ramirez v. State*, 174 N.E.3d 181, 190 n.2 (Ind. 2021)), and we will reverse "only where the decision

---

[5] The proffered records show that (1) in June 1989, Father was charged in Cause 89C01-8906-CF-116 with burglary as a Class A felony and attempted murder as a Class A felony; (2) in November 1990, Father was charged in Cause 89C01-9011-CF-104 with conspiracy to commit murder as a Class A felony and criminal confinement as a Class B felony; and (3) in late 1991, Father was convicted as charged in Cause 89C01-9011-CF-104. The proffered records contain no information regarding whether Father was convicted in Cause 89C01-8906-CF-116.

is clearly against the logic and effect of the facts and circumstances," *Russell*, 234 N.E.3d at 858 (quoting *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001)).

[19] Beau specifically contends the trial court abused its discretion by excluding evidence of Father's prior convictions. That is, Beau argues he should have been allowed to attack Father's character by introducing evidence that Father had a violent criminal history. Where, as here, the defendant has raised self-defense,[6] the defendant may seek to have admitted evidence that shows either (1) "the victim had a violent character that gave the defendant reason to fear" the victim or (2) "the victim was the initial aggressor." *Holder v. State*, 571 N.E.2d 1250, 1254 (Ind. 1991) (citing *Phillips v. State*, 550 N.E.2d 1290 (Ind. 1990), *abrogated in part on other grounds by Fry v. State*, 990 N.E.2d 429 (Ind. 2013)).

[20] Beau's defense at trial was that Father had a violent character that gave Beau reason to fear Father. In particular, Beau sought to have records and testimony admitted concerning Father's prior convictions. This type of evidence—that is, evidence of specific bad acts—"is admissible to prove that the victim had a violent character which frightened the defendant." *Holder*, 571 N.E.2d at 1254

---

[6] To the extent Beau attempts to argue that evidence of Father's prior convictions was admissible to prove Beau's effects of battery defense, this court has made clear that evidence relating to "the 'past course of conduct' is limited to 'repeated physical or sexual abuse' *of the defendant by the victim.*" *Schermerhorn v. State*, 61 N.E.3d 375, 380 (Ind. Ct. App. 2016) (emphasis added) (quoting I.C. § 35-31.5-2-109), *trans. denied*, 76 N.E.3d 141 (Ind. 2017). The effects of battery statutes do not address acts by the victim against third parties, whether or not those acts were committed in the defendant's presence. *See* I.C. §§ 35-31.5-2-109, 35-41-3-11; *Schermerhorn*, 61 N.E.3d at 380.

(citing *Phillips v. State*, 550 N.E.2d at 1297). However, before the trial court may admit evidence of specific bad acts in this context, the defendant must (1) "first introduce appreciable evidence of the victim's aggression to substantiate the self-defense claim," and (2) "provide a foundation showing that [the defendant] knew about the specific bad acts in question before" killing the victim. *Id.* (citing *Phillips v. State*, 550 N.E.2d at 1297).

[21] Assuming arguendo that Father's criminal charges and convictions from the late 1980s and early 1990s were relevant to Beau's self-defense claim, *see* Ind. Evidence Rules 401–03, and that Beau introduced appreciable evidence of Father's aggression to substantiate his self-defense claim, Beau failed to provide a foundation showing that he knew about Father's prior charges and convictions before killing Father. Beau's offer of proof established the following relevant facts: at some undefined time, Mother told Beau that Father "already had a battery charge," Tr. Vol. IV at 174, and at some undefined time, Father told Mother in front of Beau, "[I]f I go back to prison, I'm going to make it worth my time" while Father was "hold[ing] . . . the tools for the fireplace" and "standing on the hearth," *id.* at 175. So, at most, when Beau shot Father, it is likely Beau knew that Father had been charged with battery sometime in the past and had been in prison sometime in the past. This proffered evidence is not nearly enough to show that Beau knew that Father had been charged with burglary and attempted murder in 1989 or that Father had been charged with and convicted of conspiracy to commit murder and criminal confinement in the early 1990s. Because Beau failed to provide the proper foundation for evidence

of Father's prior bad acts, the trial court did not abuse its discretion by excluding that evidence at trial.

## 2. Beau's Sentence Is Not Inappropriate under Appellate Rule 7(B)

[22] Beau argues his sentence is inappropriate under Appellate Rule 7(B) and should be revised. The Indiana Constitution authorizes us to independently review and revise a trial court's sentencing decision. *Russell v. State*, 234 N.E.3d at 855–56 (citing Ind. Const. art. 7, §§ 4, 6; *Jackson v. State*, 145 N.E.3d 783, 784 (Ind. 2020)). That authority is implemented through Appellate Rule 7(B), which permits us to revise a sentence if, after due consideration of the trial court's decision, we find that the sentence is "inappropriate in light of the nature of the offense and the character of the offender." *Id.* (quoting *Faith v. State*, 131 N.E.3d 158, 159 (Ind. 2019)). Our role under this rule "is primarily to 'leaven the outliers' and identify 'guiding principles' for sentencers, rather than to achieve the 'perceived "correct" result' in each case." *Lane v. State*, 232 N.E.3d 119, 122 (Ind. 2024) (quoting *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008)). As such, "we rely on our 'collective judgment as to the balance' of all the relevant considerations involved, which include 'the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case.'" *Id.* at 122 (quoting *Cardwell*, 895 N.E.2d at 1224, 1226).

[23] Because we give "considerable deference" to a trial court's sentencing decision, *Lane*, 232 N.E.3d at 122 (quoting *Cardwell*, 895 N.E.2d at 1222), a defendant requesting revision under Appellate Rule 7(B) must present "compelling

evidence portraying in a positive light the nature of the offense and the defendant's character," *id.* (internal quotation marks omitted) (quoting *Oberhansley v. State*, 208 N.E.3d 1261, 1267 (Ind. 2023)). In reviewing the defendant's sentence, "we are not limited to the mitigators and aggravators found by the trial court," *Brown v. State*, 10 N.E.3d 1, 4 (Ind. 2014), and we "focus on the forest—the aggregate sentence—rather than the trees— consecutive or concurrent, number of counts, or length of the sentence on any individual count," *Lane*, 232 N.E.3d at 122 (quoting *Cardwell*, 895 N.E.2d at 1225). Similarly, a defendant "need not 'necessarily *prove*' that the sentence is inappropriate on both counts" so long as "one of the prongs weighs heavily in favor" of revising the defendant's sentence. *Id.* at 126–27 (emphasis in original) (quoting *Connor v. State*, 58 N.E.3d 215, 219 (Ind. Ct. App. 2016)). Nonetheless, "to the extent the evidence on one prong militates against relief, a claim based on the other prong must be all the stronger to justify relief." *Id.* at 127 (citing *Connor*, 58 N.E.3d at 220).

[24] When considering the nature of the offense, we start with the advisory sentence. *Brown*, 10 N.E.3d at 4 (citing *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind. 2007), *as amended* (July 10, 2007), *decision clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007)). Here, Beau was convicted of and sentenced for murder. "A person who commits murder shall be imprisoned for a fixed term of between forty-five (45) and sixty-five (65) years, with *the advisory sentence being fifty-five (55) years*." I.C. § 35-50-2-3(a) (emphasis added). For his murder conviction, the trial court sentenced Beau to 50 years executed at the DOC. "If . . . the person knowingly

or intentionally used a firearm in the commission of the offense . . . , the court may sentence the person to an additional fixed term of imprisonment of *between five (5) and twenty (20) years*." *Id.* § 35-50-2-11(g) (effective July 1, 2016, to June 30, 2021) (emphasis added). On the firearm enhancement, the trial court sentenced Beau to 5 years, to run consecutively to his murder sentence. In total, the trial court sentenced Beau to 55 years executed at the DOC.

[25] Because the trial court imposed less than the advisory sentence on Beau's murder conviction and the minimum sentence on his firearm enhancement, he bears "a particularly heavy burden to prove it inappropriate under Appellate Rule 7(B)." *Kincaid v. State*, 171 N.E.3d 1036, 1042 (Ind. Ct. App.) (citing *Fernbach v. State*, 954 N.E.2d 1080, 1089 (Ind. Ct. App. 2011), *trans. denied*), *trans. denied*, 173 N.E.3d 1028 (Ind. 2021). We first look to the nature of Beau's offenses and consider, among other things, "whether there is anything more or less egregious about the offense committed by the defendant that makes it different from the 'typical' offense accounted for by the legislature when it set the advisory sentence," *T.A.D.W. v. State*, 51 N.E.3d 1205, 1211 (Ind. Ct. App. 2016) (quoting *Holloway v. State,* 950 N.E.2d 803, 806–07 (Ind. Ct. App. 2011)), *as amended* (May 26, 2023). We also consider whether the offense was "accompanied by restraint, regard, and lack of brutality." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[26] There is no question that Beau's murder of Father was not accompanied by restraint, regard, or lack of brutality. Beau and Benkert lured Father into Benkert's house where Beau shot Father in the back of the neck and the head.

The first shot alone was fatal, but Beau shot Father a second time with a second gun despite Benkert telling him not to. And Beau had clearly contemplated Father's death prior to shooting him, as evidenced by text messages he sent his girlfriend the day before the murder.

[27] In considering the character of the offender, "we engage in a broad consideration of a defendant's qualities," *T.A.D.W.*, 51 N.E.3d at 1211 (citing *Aslinger v. State*, 2 N.E.3d 84, 95 (Ind. Ct. App. 2014), *clarified on other grounds on reh'g*), including whether the defendant has "substantial virtuous traits or persistent examples of good character," *Stephenson*, 29 N.E.3d at 122. We also consider the defendant's status as a juvenile at the time of the offense. *See Fuller v. State*, 9 N.E.3d 653, 657–659 (Ind. 2014); *Brown*, 10 N.E.3d at 6–8; *Carter v. State*, 711 N.E.2d 835, 842–43 (Ind. 1999).

[28] Beau was only 16 years old at the time of the offense, and there was evidence presented at trial that Beau suffered from post-traumatic stress disorder, which the diagnosing doctor linked to Father's alleged emotional and physical abuse of Beau. However, Beau showed a complete lack of remorse for killing Father; in fact, Beau celebrated Father's death, taking photos and videos of Father's body, including close-up images of Father's head surrounded by a large pool of blood. Beau allowed Benkert to take the fall for Father's murder, and Beau himself initially fed into this version of events, telling Mother and law enforcement that Benkert was responsible. Furthermore, within days of the shooting, Beau showed off bullets and a gun to his girlfriend, and he later had tattooed on his chest images of the guns he used to shoot Father.

[29] Although Beau did not have any juvenile adjudications or adult criminal history before murdering Father, he did have a demonstrated history of violent behavior. Just the day prior to the shooting, Beau had been in a fight at school and continued to verbally spar with his classmates after being suspended. Beau was also charged with two counts of battery as Level 5 felonies and one county of resisting law enforcement as a Class A misdemeanor while incarcerated and awaiting trial in this case.

[30] Based on the serious nature of Beau's offense and his apparent pride in committing it, we cannot say that Beau has produced compelling evidence demonstrating that the nature of his offense or his character renders his mitigated sentence inappropriate. *See Fuller*, 9 N.E.3d at 658–659 (85 year sentence for 15-year-old's two murder convictions and one robbery conviction); *Carter*, 711 N.E.2d at 843 (50 year sentence for 14-year-old's one murder conviction).

## Conclusion

[31] In sum, the trial court did not abuse its discretion by excluding evidence of Father's prior criminal charges and convictions, and Beau's mitigated sentence is not inappropriate under Appellate Rule 7(B). We therefore affirm the trial court on all issues raised.

[32] Affirmed.

Mathias, J., and Foley, J., concur.

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Jennifer Anwarzai
Deputy Attorney General
Indianapolis, Indiana